**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      -against-

S1 17-CR-657 (SDA)

DMITRY SAZONOV,

           Defendant.

**SENTENCING MEMORANDUM OF DMITRY SAZONOV**

Michael Tremonte
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
Phone: (212) 202-2600
Fax: (212) 202-4156
Email: mtremonte@shertremonte.com

## PRELIMINARY STATEMENT

Dmitry Sazonov respectfully submits this sentencing memorandum by and through his undersigned attorneys in connection with his sentencing, which is scheduled for January 25, 2018, based on his guilty plea to a misdemeanor attempted violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C), (b), and (c)(2)(A).[1]

Mr. Sazonov accepts full responsibility for his conduct. Apart from the instant offense conduct, however, Mr. Sazonov has led a law-abiding life that is, in nearly all respects, exemplary. Since arriving in the United States, he has endeavored to build an ordered and prosperous life in this country for his wife and their three children, maintaining consistent, full-time employment until the events that ultimately brought him before this Court. He is a deeply devoted parent; all of his efforts have been centered on providing his children the kind of safe, nurturing upbringing that Mr. Sazonov lacked growing up in Russia. He is widely viewed by friends, family, and the members of his neighborhood and faith communities as a good man and an upstanding citizen. Viewed in the full context of his history and personal characteristics, Mr. Sazonov's conduct in this case is completely aberrant, entirely inconsistent with his true character. Although difficult to reconcile, the conduct at issue occurred during a period of extreme distress. Mr. Sazonov was in the midst of a life-shattering divorce, facing extraordinary uncertainty about his future. He felt helpless in the face of grave doubts about the stability of his marriage and his role as provider for his children, due in part to the loss of the job he had successfully held for nearly thirteen years.

---

[1] We attach to this submission a wealth of letters from family, friends, and members of Mr. Sazonov's community. Exhibit A. Some of these letters were written in support of an application for a deferred prosecution we made to the U.S. Attorney's Office and reference that request. However, all of the letters speak to Mr. Sazonov's character and, accordingly, we provide them for the Court's consideration of the appropriate sentence.

During the past year, Mr. Sazonov has struggled to reconcile his conduct in this matter with his otherwise unblemished, law-abiding life.  He has been unable to find work and his family's welfare has been a constant worry.  He recognizes that his shattered life is the result of his own actions and, rather than give in to despair, he has resolved never to stray again. Mr. Sazonov has recommitted himself to his faith and is working hard to find gainful employment.  Mr. Sazonov's first and only offense will certainly be his last.

The Sentencing Guidelines in this case recommend a sentence of 0-6 months, which, in Zone A of the Sentencing Table, may be imposed without imprisonment.  The Probation Department has recommended a sentence of three years' probation.  Given the nature and circumstances of the offense, Mr. Sazonov's personal history and characteristics, and other relevant factors, we respectfully submit that a sentence of six months' probation is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

### I.      Personal History and Characteristics

Mr. Sazonov was born in 1972 in Syrzan, a small city in Russia (then the Soviet Union) near the Volga River.  His mother was a general physician and his father was an electrical engineer.  Despite his parents' professions, they were disadvantaged in Communist Russia because of their background, as Mr. Sazonov's maternal grandfather had been a well-known general in the Russian Army who was persecuted by Stalin in the 1930s as an "Enemy of the People."  The family's reputation and security significantly diminished after this period, during which his mother's family was dispossessed and forced to relocate to a different part of the country.  Mr. Sazonov's mother, who was a baby during World War II, was hit by a German

bullet while being carried in her mother's arms in the family home, during the Nazis' retreat from the Russian Army.

Mr. Sazonov's parents struggled to find sufficiently remunerative work; as a result, they moved frequently, seeking employment in undesirable, remote locales where professionals were paid a premium to endure harsh living conditions. Thus, when Mr. Sazonov was a child, the family moved repeatedly from one unpleasant place to another.

Not surprisingly, because the family did not put down roots, he struggled to make new friends – so much so, that he ultimately stopped making the effort to find friends and instead became introverted. Mr. Sazonov was also frequently ill. He contracted kidney disease at age two and was hospitalized for a year. When he was eight, the family moved to Surgut, a city centered around the oil and gas industry in Siberia. Conditions there were difficult, and the move was an especially tough adjustment for the increasingly awkward young Mr. Sazonov. He was targeted by bullies at school, who physically abused him. Some of the beatings were so severe that they required hospitalization. Mr. Sazonov's parents were constantly afraid for his health and safety. Although his parents earned a living, under the Soviet regime they were never able to achieve the stability they wanted.

Although Mr. Sazonov was an outsider and had few, if any, friends, he was a good student. He performed well in school, and excelled particularly at math. When he was sixteen, a teacher came into his Algebra class and asked if anyone wanted to learn to use a computer. This was a lifeline for Mr. Sazonov. He had a natural ability to learn coding language and he excelled under the guidance of this computer teacher, who recognized his natural ability and curiosity. After high school, Mr. Sazonov was awarded a college scholarship sponsored by Gazprom, the Russian natural gas company. The scholarship was conditioned, however, on his working for the

government after school.  Because of Mr. Sazonov's family's history and as a matter of personal conscience, he was unwilling to accept government employment.  He therefore turned down the scholarship, and instead paid his own way at the Gubkin Russian State University of Oil and Gas in Moscow, a university known for its relative independence from the Soviet Regime (including, for example, its willingness to admit Jewish students who were barred from other colleges).  Mr. Sazonov worked his way through college, holding various odd jobs, and coded in his free time while he took computer science courses.

In 1992, Mr. Sazonov joined the International Church of Christ, which profoundly influenced his worldview.  The denomination believes in a kind of moral absolutism and its members are dedicated to proselytizing.  The early 1990s were heady times in post-Glasnost Moscow, with many of Mr. Sazonov's contemporaries entering the business world, going to parties, and generally celebrating their newfound freedom.  Mr. Sazonov, by contrast, strictly abstained from any activity that was viewed, from the perspective of his faith, as un-Christian. Even as many of his countrymen became obsessed with avoiding government obligations, Mr. Sazonov scrupulously paid taxes, even when he was paid for his work in cash.  He was fired from one job, because he refused to uphold his end of the "bargain" of being paid in cash, *i.e.*, not to declare his income.  In a retreat from increasing moral uncertainty and anomie, Mr. Sazonov threw himself into the activities of the church, and stayed in Moscow, rather than returning to Siberia where a high-paying job in the oil and gas industry would be available, to be with his congregation.

After graduating from college, Mr. Sazonov worked as a software developer for several private companies in Moscow in the 1990s.  He built accounting, network, and telephone system support software.  He also tried his hand as an entrepreneur, and in 1999, working with partners,

founded Woman.ru – the first (and then largest) Internet portal in Russia geared toward women. The site was modestly successful, and Mr. Sazonov sold it for a modest profit in 2001.  It currently has 20 million daily users.

Also in 1999, Mr. Sazonov came to the United States for the first time.  He came on a business visa to work for a Russian company; while here, he was offered a different job working for Infodesk, an American information management company.  Mr. Sazonov declined because he did not want to overstay his work visa.  Instead, he returned to Russia and only agreed to come back to the United States to work for Infodesk if they sponsored him for an H1-B visa. Obtaining the visa required him to undergo a lengthy waiting period, during which Infodesk arranged for him and his then girlfriend (later, his wife) Olga to work for Infodesk in the Dominican Republic.

Mr. Sazonov met Olga in 1998.  They were engaged in Moscow and she agreed to move with him to the Dominican Republic in anticipation of receiving approval to live and work in the United States together.  In 2000, they were married.  Finally, in 2001, Mr. Sazonov's visa was approved, and he and Olga arrived together in New York in September 2001 – just days before the tragic events of 9/11.  One of their first experiences in their new home was going downtown to give blood after the attacks on the World Trade Center.

Mr. Sazonov worked at Infodesk from 2001 to 2004.  In 2004, he was laid off when the company ran out of funding to pay employees.  He continued working for the company for months without pay in the hopes that its financial condition would improve and he would be able to keep his job.  The timing was unfortunate, as Mr. Sazonov and his wife had just purchased a house in Valley Cottage, New York, and were expecting their first child at the time.  Unable to continue working at Infodesk without pay, he worked every odd job he could find – from pizza

delivery to bussing tables in a Mexican restaurant.  Mr. Sazonov continued seeking employment as a software engineer; working with a recruiter, he was introduced to and accepted employment with the financial firm Susquehanna International Group, LLP ("SIG" or "the Company") in July 2004.

From the beginning of his tenure at SIG, Mr. Sazonov worked closely with Brendan Culligan, an SIG trader.  Not himself a trader, Mr. Sazonov worked for Mr. Culligan in a supporting role.  His principal effort was to develop an improved trading platform for Mr. Culligan.  The trading platform is distinct from the trading algorithms, which are embodied in code that is separate from, and which run on, the platform.  In concept, the trading platform serves as an interface for the traders, analogous to the use of a word processing program (such as Microsoft Word) for a writer. Mr. Sazonov's platform was innovative in certain respects; for example, unlike most such platforms (including the one widely in use at SIG), it was not written in Linux or C++, but rather in C Sharp.  The first iteration of Mr. Sazonov's platform, called "Boss," was subsequently improved and renamed "Soqrates."  Soqrates was ultimately adopted by the Company as its main trading platform.

Mr. Sazonov's first years at SIG were the happiest of his life.  In addition to finding success at work, he and his wife were happy together, had a home of their own in the suburbs, and had started a growing family – his wife gave birth to a daughter in 2004 and the couple had twins in 2006.  Mr. Sazonov was brimming with confidence in his newly-adopted country; America had given him a chance a different life – one of happiness, security and freedom – than he had ever imagined in Russia.

Mr. Sazonov continued to serve SIG faithfully.  Notably, Mr. Sazonov's contribution – even taking into account his foundational work on the Company's main trading platform – did

not earn him outsized financial rewards.  Unlike the traders who devised actual trading strategies, Mr. Sazonov's compensation was not significantly impacted by the success of SIG's trading strategies.  In other words, he was compensated modestly as a coder, but not on the basis of the profitability of the trading platform he developed or the algorithms that others devised and ran through Soqrates.  Thus, Mr. Sazonov earned a comparatively modest salary in each of his years at the Company, starting at $90,000 annually and, over thirteen years, reaching a salary of $150,000.  Mr. Sazonov received bonuses in addition to his base salary, starting from approximately $15,000 and increasing over his tenure at the Company.  Mr. Sazonov's anticipated bonus for his last full year of work for SIG, 2016 – which he did not receive – was approximately $80,000.

For many years, Mr. Sazonov was the sole breadwinner for the family because his wife was not able to work (due to visa issues and the demands of a young family), and he has always been extremely cognizant of, and anxious about, the possibility that his employment could end and he might quickly find himself again in the desperate economic situation he faced after losing his job at Infodesk, prior to finding steady employment at SIG.  Above all, Mr. Sazonov feared being laid off, and finding himself back bussing tables, unable to pay his mortgage and support his family.  In the absence of extended family in the United States or any other support structure, Mr. Sazonov felt the entire weight of his family's survival was on his shoulders.

Although his working days were committed to SIG, Mr. Sazonov's principal focus over the past decade has been his family.  He is a devoted father to his daughter and twin son and daughter.  He delights in spending time with his children, spending hours with them making up elaborate games, reading to them and helping with their homework, and playing sports and attending sporting events.  He is an active presence in their lives, and takes every opportunity to

be involved with them – for example, he built them an ornate playhouse, modeled on a Russian fairytale, and appeared with his younger daughter in multiple school theatrical performances.  He also plays an active role in ameliorating the impact of his son's epilepsy.  Mr. Sazonov is unabashed in exclaiming his love for his children.

However, despite Mr. Sazonov's commitment to his family, in recent years his marriage suffered.  In approximately 2012, he and his wife began arguing, and over time the arguments became increasingly divisive.  Their marriage suffered and began to come apart.  For several years, Mr. Sazonov and his wife did their best to conceal their growing mutual dissatisfaction from their children; thus, even though they lived together in the family home, and maintained their relationship for the sake of their young children, they essentially acted like a separated couple, each inhabiting his or her own sphere.  The strain on their marriage intensified in in 2012 and 2013, after both Mr. Sazonov's father and his wife's father fell sick and passed away.  Both Mr. Sazonov and his wife traveled separately back to Russia to attend to their ailing fathers.  These commitments entailed difficult and expensive travel and too much time away from their home, eventually causing each to feel that the other was failing to pay sufficient attention to the children and to provide necessary emotional support.  In late 2013, Mr. Sazonov's wife began seeing another man.  This proved too much for Mr. Sazonov to continue living with his wife, and they separated in February 2014.

Mr. Sazonov did not want to be separated from his wife and children.  He was unable to cope with not seeing his children for extended periods.  In response to the deterioration of his marriage and his relationship to his children, he sought mental health treatment, and eventually saw three separate psychiatrists.  In April 2014, in an attempt to mitigate the adverse psychological effects of the separation, Mr. Sazonov moved back into the family home, even

though he and his wife remained officially – and for all intents and purposes – separated.  In anticipation of getting divorced, the couple began negotiating the financial and practical aspects of the termination of their marriage, and Mr. Sazonov began paying spousal support.  Their living situation was tense and their fights occasionally became vituperative.  They each filed for divorce against the other in December 2016 (they have since reconciled).

At the beginning of 2017, as a result of his untenable domestic situation and the prospect of his marriage ending, in addition to the stress of not knowing how he could afford to support two separate households and still provide a good life for his children, Mr. Sazonov's psychological condition deteriorated significantly.  As diagnosed by his therapist, he was suffering from severe accumulated stress.  *See* Letter of Larisa Maysheva.  Compounding this dire situation, the one area of his life where he believed he still had some constancy and control – his work – was about to unravel as well.

## II.      Offense Conduct

Brendan Culligan, the trader for whom Mr. Sazonov worked and his effective patron at the company, resigned from SIG on or about February 2, 2017.  Mr. Sazonov immediately became concerned about his future with the Company, as much of his success there had been dependent on his strong working relationship with Mr. Culligan, a profitable trader.  When management asked to meet with Mr. Sazonov the following Monday, he correctly assumed the worst – that he would lose his job after more than a decade at SIG.

The actions taken by Mr. Sazonov in response to learning that Mr. Culligan had been forced to resign must be understood in light of the totality of the circumstances impacting his state of mind at the time.  He had been employed by SIG for nearly thirteen years, during which time Mr. Sazonov had achieved a measure of economic and professional stability unlike anything

he had previously known.  He was also unfortunately embroiled in a harrowing and protracted marital dispute that he feared would result in the breakup of his previously very happy home. Without the financial security that his job represented, he knew that he would be unable to provide adequately for his wife and children, and he feared that he would lose custody of his children entirely.  As his therapist notes, during this time Mr. Sazonov was plagued by a constant fear of losing his children.  *See id.*  Generally, he had less control over his emotions than at any time in his adult life.  In sum, when he learned of Mr. Culligan's resignation and his own likely dismissal from the firm, Mr. Sazonov felt himself to be on the brink of losing everything, and of having his life in the United States end in failure, thereby reprising a long family history of tragic reversals of fortune.

The details of the offense conduct reflect Mr. Sazonov's unsettled and anxious mental state.  When Mr. Sazonov came into work on Monday following Mr. Culligan's resignation, he had several moments of panic in which he moved company files into his personal folder, where they were intermingled with his personal files, and then deleted them from his personal folder. He repeated this process several times before he was called into a meeting with management in which he was terminated.  As set forth in his allocution, after he was terminated, Mr. Sazonov re-entered the building with the intention of accessing his computer to delete any company files that remained in his personal folder.  This attempt, though it was ham-handed and, indeed, criminal, reflected an impulse to *correct*, rather than engage in, wrongdoing.  Nevertheless, when Mr. Sazonov reached his computer and noticed co-workers around, he abandoned his plan and left the office.  The details of his conduct in these final hours of his employment at SIG reveal an internal struggle – a struggle that is indicative of an intact moral compass, which under less stressful conditions would have served as a sure check against misconduct.  His actions were

anxious and distracted, and indicative of severe emotional distress, rather than any cold or calculating effort to break the law.

### III.      Arrest, Plea, and Presentence Report

Mr. Sazonov was arrested on April 12, 2017, and charged by criminal complaint on April 13, 2017.  On October 25, 2017, he pled guilty to a Superseding Misdemeanor Information before the Honorable Ronald L. Ellis.  At the plea, Mr. Sazonov allocuted as follows:

> On February 6, 2017, after I was terminated from my job, I was escorted from the building and locked out of my computer.  I knew that I was not authorized to access my computer after I had been terminated.  A few hours later, I went back to my office with the intention to access my computer.  My plan was to delete some company files which I was previously saved in a folder together with some personal documents.  When I arrived, however, some of my former co-workers were around so I did not access the computer. Instead, I left the office.  I knew my actions were wrong and I apologize to the Court.

Tr. of Plea 16:18-17:4, *United States v. Sazonov*, 17-MJ-2798 (RLE) (S.D.N.Y. Oct. 25, 2017).

The Presentence Report, the final version of which was filed on January 16, 2018, found that the applicable Sentencing Guideline was U.S.S.G. § 2B1.1.  PSR ¶¶ 4, 27.  It found that the base offense level was six, pursuant to U.S.S.G. § 2B1.1(a)(1).  *Id.*  Pursuant to § 2B1.1, the offense level is not increased because the loss amount did not exceed $6,500.  *Id.*  The Probation Department found that, pursuant to § 2B1.1(b)(10)(C), the offense level is increased by two levels because the offense involved sophisticated means.  *Id.*  Because the resulting offense level is less than 12, the offense level is increased to 12.  *Id.*  However, pursuant to U.S.S.G. § 2X1.1(b)(1), the offense level is decreased by three levels because it was an attempt, and because Mr. Sazonov accepted responsibility, the total offense level is further decreased by two levels, pursuant to § 3E1.1(a).  *Id.* ¶¶ 28, 34.  Thus, the applicable Guidelines offense level is 7. *Id.* ¶ 35.  Because Mr. Sazonov is in Criminal History Category I, *see id.* ¶¶ 37-39, the Sentencing Guidelines range is zero to six months.  *Id.* ¶ 75.  Because the applicable Guideline

range is in Zone A of the Sentencing Table, imprisonment is not required under the Guidelines. *Id.*

The Probation Department recommended a sentence of three years' probation, noting that "[w]e do not believe that a term of imprisonment is appropriate in this case given [Mr. Sazonov's] familial responsibilities and lack of a significant criminal history record."  PSR at 23. The Probation Department also recommended special conditions of 100 hours of community service, financial disclosure, and a search and seizure condition "given the sophisticated and technological nature of the instant offense."  *Id.* at 23-24.  In addition, the Probation Department noted that Mr. Sazonov "appears to understand the seriousness of his actions" and he "expressed remorse and regret for his actions and added that he has become a better, more spiritual person." *Id.* at 23.

### IV.     Outstanding Objections to the Presentence Report

By letter dated January 3, 2018, the undersigned objected to paragraphs 6 through 19 of the draft PSR, which describe certain events that preceded the offense conduct, but were not part of the offense itself.  Because these issues do not affect the Guidelines calculation or, we submit, have any bear material bearing on the Court's sentencing determination, the Court need not address them.  *See United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005); Fed. R. Crim. P. 32(i)(3)(B).

The defense objects to paragraphs 21 and 86 of the final PSR, which state that restitution is owed to Susquehanna International Group, LLP, in the amount of $156,255.22.  We are currently in discussions with the government as to the correct and appropriate amount of

restitution, if any, and we are hopeful that we can resolve that issue within ninety days following sentencing without the need to involve the Court.

The defense also objects to paragraph 22 insofar as it states that "If [proprietary information on the protected computer] were to have been removed if the defendant's attempted access succeeded, the dissemination or use of the information on the computer would have caused damage to [SIG]." That assertion – stated as speculative hypothetical – is contradicted by the uncontroverted fact that Mr. Sazonov attempted to access the computer to *delete* company data that was stored in his personal folder, *see* PSR ¶ 25 not to disseminate it,, and the recognition in both the plea agreement and the Guidelines calculation conducted by the Probation Department that the loss amount, which pursuant to U.S.S.G. § 2B1.1 application note 3 is the greater of actual or *intended* loss, is, in this case, zero.

## ARGUMENT

### I.    Legal Standard

In imposing a sentence in a criminal case, district courts are guided by the factors set forth in 18 U.S.C. § 3553(a). In applying these factors, courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary, to serve the purposes of sentencing.'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). One of the § 3553(a) factors is the "kinds of sentence and sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [Guidelines]," 18 U.S.C. § 3553(a)(4), and here, pursuant to United States Sentencing Guidelines, the recommended sentencing range is zero to six months, which may be achieved without any term of imprisonment. In determining the appropriate sentence, the Court must "make an individualized assessment based on the facts presented." *Gall v. United States*,

552 U.S. 41, 50 (2005).  In so doing, the Court must consider the factors set forth in § 3553(a),

including the "nature and circumstances of the offense" and the "history and personal

characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and impose the *minimum* sentence

necessary to achieve the purposes of sentencing, while avoiding "unwarranted sentence

disparity," *id.* § 3553(a)(6).

**II.     The § 3553(a) Factors Support a Sentence of Six Months' Probation**

      **A.     Mr. Sazonov's Personal History and Characteristics Warrant
Leniency**

      Mr. Sazonov's long history of law-abiding conduct, and the fact that the offense is

completely out of keeping with his character, are factors that strongly counsel in favor of a non-

incarcerative sentence.  First, both before and after *Booker*, case law has recognized that a

defendant's prior law-abiding life mitigates culpability and decreases the need for a lengthy

sentence.  *See Zecevic v. U.S. Parole Comm'n*, 163 F.3d 731, 735 (2d Cir. 1998) (describing

then-mandatory Guidelines' allowance for departure where crime was aberrant behavior

constituting "a short-lived departure from an otherwise law-abiding life" (internal quotation

marks omitted)); *United States v. Khalid*, No. 09-cr-734 (JBW), 2011 WL 6967933, at *2

(E.D.N.Y. Dec. 13, 2011) (imposing a below-Guidelines sentence where defendant's conduct is

"out-of-keeping with [the defendant's] otherwise law-abiding and responsible life"); *United

States v. Toback*, No. 01-cr-410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005) (same).

      Mr. Sazonov's lack of criminal history is a strong indicator that he is unlikely to

recidivate.[2]  *See United States v. Greene*, 249 F. Supp. 2d 262, 267 (S.D.N.Y. 2003) (imposing

below-Guidelines sentence because "it is highly unlikely that Greene will repeat his criminal

---

[2]     As noted in the PSR, Mr. Sazonov has one prior violation for driving with ability
impaired, a traffic infraction.  PSR ¶ 37.

conduct given that he . . . previously had no criminal history points"); *see also United States v. Cosme*, No. 06-cr-608 (JBW), 2010 WL 276599, at *2 (E.D.N.Y. Jan. 19, 2010) ("Specific deterrence is satisfied because it is improbable that [defendant] will engage in further criminal activity in light of his lack of any prior criminal history, acceptance of responsibility, . . . and supportive family members."). A recently released report by the United States Sentencing Commission also suggests that an individual's "[c]riminal history score and Criminal History Category are strong predictors of recidivism." U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 6-7 (2017) (noting that recidivism rates range from 30.2% of offenders with zero criminal history points to 85.7% of offenders with 15 or more criminal history points). Perhaps for these very reasons, in establishing the Sentencing Commission, Congress directed that non-incarceratory sentences are generally appropriate for first-time offenders, like Mr. Sazonov, where the offense is not a "crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j); *see Mistretta v. United States*, 488 U.S. 361, 377 (1989) (relying on § 994(j) and other provisions to conclude that, "although Congress granted the Commission substantial discretion in formulating Guidelines, in actuality it legislated a full hierarchy of punishment – from near maximum imprisonment, to substantial imprisonment, to some imprisonment, to alternatives – and stipulated the most important offense and offender characteristics to place defendants within these categories.").

Indeed, this offense stands in stark contrast to Mr. Sazonov's character and his exemplary prior conduct as a highly productive member of society, devoted husband and doting father. The multitude of letters from friends and supporters that we have received instead paint a picture of a man who is a pillar of his community, an active member of his church, and a loving father who is energetically devoted to his young children. Several letters describe the atmosphere he created

for them at home as a "fairy tale."  Letter of Mikhalev Viktor.  Mr. Sazonov is a person who also takes responsibility for his relatives, with several letters describing the efforts he undertook traveling to Russia to make his father's last days comfortable, and the toll that took on him.  *See* Letter of Antonia Volkova.  Mr. Sazonov is also "a devoted, true, and trusted friend," Letter of Alexey Makarov, who opened his home to a friend when he had no place to live for several months, *see* Letter of Boris Tarasov.  Several letters also speak to Mr. Sazonov's faith and dedication to his Orthodox Christian community.  *See* Letters of Fr. George Larin, Dmitry Anisimov; Dasha Bessonov; Vasily Serdtzev, and Mark and Grigory Kotlyarov.  These qualities have been repeatedly found by courts to be mitigating and deserving of leniency.  *See Toback*, 2005 WL 992004, at *5 (imposing a below-Guidelines sentence where "letters from [the defendant's] family, colleagues and friends speak to his outstanding and reliable character, his devotion to his family and his dedication to his business"); *accord United States v. Gorodetsky*, 288 F.R.D. 248, 248 (E.D.N.Y. 2013) (imposing below-Guidelines sentence where defendant "plays an active, positive role in [his] community"); *United States v. Bracken*, No. 08-cr-207 (JBW), 2010 WL 2816591, at *2 (E.D.N.Y. July 13, 2010) (imposing sentence of probation where, "[p]rior to his involvement [in criminal conduct], [the defendant] had lived a highly responsible life," and "devoted himself to his family, his community, and his country").

At the same time, Mr. Sazonov's well of caring for people may be the flip side of the emotional fragility that caused him to engage in the offense conduct.  His friend Andrey Tovchigrechko says that Mr. Sazonov has an "emotional personality" and that the "prospect of losing everyday contact with his three beloved children put him in a state of upheaval and anxiety."  Letter of Andrey Tovchigrechko.  His therapist Larissa Malysheva too notes his constant fear of losing his children.  Letter of Larissa Malysheva.  Friends who know him well

also put his transgression in context, despite not knowing any of the details.  For example, Andrewy Visknevskiy, a friend who runs his own business, notes that Mr. Sazonov is "open, kind, and selfless," but "not organized enough to start thinking about building his own business or create competition to companies working in his field."  Letter of Andrewy Visknevskiy. Rather, "his head is too often in the clouds with simple thoughts of his children, his family, and his friends."  *Id.*  This is of course not an excuse for his criminal conduct, but rather explains how someone who has lived in the upstanding way Mr. Sazonov has would commit the instant offense in an emotional reaction to a high-anxiety situation, taken in the face of helplessness and insecurity about everything from his employment prospects, to his ability to find comparable employment elsewhere, to his ability to continue to support his family.  Tragically, by acting on those fears, Mr. Sazonov has seriously jeopardized his employment prospects, having been unable to keep a job since his arrest based on the press attention that has attended this case, and he continues to live with profound regret for his conduct everyday as he now struggles to support his family.

Mr. Sazonov has recognized that his severe emotional distress led him to stray from his otherwise upstanding behavior and that he had a serious lapse of judgment.  He has taken steps to address this problem in himself and to make amends with his community.  He has committed himself to his church, reconnecting with his religion and contributing to his congregation.  He has found new meaning in Christian teachings about the restoration of the fallen, and he has channeled his remorse and regret about his conduct into good works and self-improvement.  He has also tried valiantly to reenter the work force in order to provide for his family, but, as noted, he has struggled to retain employment once employers google him and learn about his arrest in this case.  A sentence that removes Mr. Sazonov from the community will extinguish any job

opportunities he currently has, and, as the current sole breadwinner for his family, will dramatically destabilize the already-upended lives of his children.

### B.    Courts in This District Typically Impose Probation for Misdemeanors

As noted above, the Probation Department recommends a sentence of three years' probation and argues that imprisonment is inappropriate in this case.  We agree, and note that the recommendation of a non-incarceratory sentence is consistent with the general sentencing practices of courts in the Southern and Eastern Districts of New York.  While we cannot provide an exhaustive list of sentences in misdemeanor cases, which are relatively rare in federal court, we have found the following sentencing outcomes, which indicate that courts in this and the Eastern District typically impose some period of probation, and no prison time, when sentencing defendants convicted of misdemeanors:  *United States v. Jabbi*, 17-Mj-8326 (JCM) (ten months' probation); *United States v. Han*, 17-Cr-49 (KMW) (time served, day of arrest, one year supervised release); *United States v. Tucker*, 17-Cr-682 (HBP) (two years' probation); *United States v. Jackson (Caballero)*, 16-Cr-750 (JSR) (one year probation); *United States v. Jager*, 16-Cr-665 (BCM) (one year probation and community service); *United States v. Conaway*, 16-Cr-422 (AJP) (five years' probation and community service); *United States v. Parish (Cummings)*, 16-Cr-212 (LAK) (time served and one year supervised release); *United States v. Pilla*, 15-Cr-783 (RLE) (time served and one year supervised release); *United States v. Rubin (Rivky Rubin)*, 14-Cr-741 (KMK) (time served, the day of the defendant's arrest); *United States v. Acosta*, 12-Cr-751 (JFK) (three years' probation, with early termination granted); *United States v. Kiamanesh*, 99-Cr-418 (KNF) (fifteen months' probation).  This Court should follow the recommendation of the Probation Department and the well-established practice of courts in this circuit and impose a non-incarceratory sentence.  A sentence of probation will also avoid

creating any unwarranted disparity between Mr. Sazonov and other defendants convicted of misdemeanors, consistent with the directive of 18 U.S.C. § 3553(a)(6).

> **C.      A Sentence of Six Months' Probation Is Sufficient to Meet the Goals of Sentencing**

As mentioned above, district courts have an "overarching duty" to determine a sentence that is "sufficient but not greater than necessary to achieve the purposes of sentencing."  Pepper, 552 U.S. at 493 (internal quotation marks omitted).  Those purposes include:  "[t]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct;" and "to protect the public from further crimes of the defendant" and the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).  Here, a sentence of six months' probation is sufficient, but not greater than necessary, to achieve each of those purposes.

First, neither an incarceratory sentence nor the sentence of three years' probation recommended by the Probation Department is needed to reflect the seriousness of the crime or provide just punishment.  Neither we nor Mr. Sazonov seek to minimize the seriousness of the offense in any way – indeed, as noted in the PSR, he is acutely aware of its seriousness in that he has already experienced severe consequences in terms of restrictions on his liberty and loss of employment options as a result of his arrest.  But, as detailed above, courts frequently find that a sentence of probation is sufficient to reflect the seriousness of and provide just punishment for a misdemeanor offense.  Here, where the offense was an attempt, six months' probation, on top of the nine months of pretrial supervision Mr. Sazonov has already completed and the life-altering collateral consequences Mr. Sazonov has and will continue to face, is sufficient to meet these

purposes of sentencing.  *See generally United States v. Nesbeth*, 188 F. Supp. 3d. 179 (E.D.N.Y. 2016) (holding that sentence of one year probation was appropriate in light of collateral consequences of conviction, including bars to employment).

A sentence in excess of six months' probation is not necessary to promote respect for the law on the part of Mr. Sazonov, to deter him from future criminal conduct, or to protect the public from future crimes.  Such considerations have been held to be entitled to little weight where the crime is "an aberration in [the defendant's] normally law-abiding life."  *Toback*, 2005 WL 992004, at *5; *accord Khalid*, 2011 WL 6967933, at *2 (imposing a below-Guidelines sentence where defendant's conduct is "out-of-keeping with [the defendant's] otherwise law-abiding and responsible life").  As we have emphasized, this offense is Mr. Sazonov's first serious criminal offense and is out of keeping with his otherwise law-abiding, moral life, which may be explained by the particular constellation of career and family stresses that caused his lapse of judgment.

Further, deterrence has already been achieved in this case in substantial measure based on the arrest, the nine months Mr. Sazonov has already spent on pretrial supervision (with which he has been fully compliant), and the collateral consequences of being convicted of a federal crime. Mr. Sazonov feels deep remorse for his actions and recognizes that he has put himself and his family in jeopardy – the very outcome he most feared.  The soul-searching this case has occasioned has produced positive effects in his life.  Recognizing that Mr. Sazonov is in the deepest crisis of his life, his wife has reconciled with him, and the two are working together to rebuild their relationship and put it on a more secure footing going forward, not least of all to protect their children.  Mr. Sazonov has also faced the anxieties and insecurities that have affected him since his immigration to the United States – really, since childhood – and is

committed to working through these issues in partnership with his wife and his therapist, and as a more devoted member of his faith community.  Simply put, Mr. Sazonov will never again allow himself to be overcome by emotional distress such that he would lose his moral compass as he did in this case.  Specific deterrence has therefore been achieved.  In terms of general deterrence, the press coverage attendant upon Mr. Sazonov's arrest ensures that other employees of financial firms with access to valuable computer data will be deterred seeking to access their companies' computers after they are terminated.

Finally, a longer term of probation is not necessary to provide Mr. Sazonov with vocational or educational opportunities or medical treatment.  To the contrary, a further period of probation will make it more difficult for him to obtain and keep employment, as it will restrict his ability to travel for work.

As noted, Mr. Sazonov has already been on pretrial supervision for more than nine months, and the additional three years' probation recommended in the PSR is unnecessary to effectuate any goal of sentencing or the public interest, nor is monitoring Mr. Sazonov for that long an efficient use of the Probation Department's limited resources.   Accordingly, a more modest period of probation of six months will be sufficient, and not greater than necessary, to meet the purposes outlined in 18 U.S.C. § 3553(a).

### D. Probation's Recommended Search and Seizure Special Condition of Probation Is Unnecessary

The Probation Department has recommended that Mr. Sazonov be subject to a special term of probation whereby he is subject to random searches and seizures because, it reasons, the offense involved a "sophisticated technological nature."  PSR at 24.  Beyond that vague formulation, the PSR offers no explanation as to why a search and seizure condition is "reasonably related" to the offense or any of the § 3553(a) factors, where there is no allegation

that Mr. Sazonov has ever engaged in any conduct that could be repeated outside of the context of his employment at SIG, a circumstance that is certain not to repeat. *United States v. Abrar*, 58 F.3d 43. 46 (2d Cir. 1995). Because no rational justification exists for the search and seizure condition, the Court should decline to impose it. We have no objection to the Probation Department's special condition of community service, nor to the condition of financial disclosure in the event that the Court ultimately imposes restitution.

## **CONCLUSION**

For the reasons set forth above, we respectfully request that the court impose a sentence of six months' probation, which will be sufficient but not greater than necessary to achieve the purposes of sentencing set forth in § 3553(a).

<div style="margin-left: 40%;">

Respectfully submitted,

/s/Michael Tremonte
Michael Tremonte
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
Phone: (212) 202-2600
Fax: (212) 202-4156
Email: nbiale@shertremonte.com

*Attorneys for Dmitry Sazonov*

</div>